# Commonwealth *v.* Boyle, Appellant.

*Criminal law—Kidnaping—Evidence—Circumstantial evidence—Jurisdiction.*

Where a man and a woman go to a town in Pennsylvania, give themselves out as man and wife, stay there for a time, and then leave, falsely stating that they are going to a distant state, but in fact going to a city in an adjoining state, and thereafter the man returns to the town in Pennsylvania, there kidnaps a boy and takes him to the city in the adjoining state where the woman had prepared lodgings for the boy's reception, the woman may be convicted of the overt act in Pennsylvania by her own declarations showing knowledge of pre-existing facts and conditions in the Pennsylvania town, and by evidence of the whole course of her connection with the reception, detention and subsequent release of the child, including the fact that the very money that was paid for the release of the child was found after her arrest secreted on her person.

Argued Oct. 3, 1910. Appeal, No. 117, April T., 1910, by defendant, from judgment of O. T. Mercer Co., April Sessions, 1907, No. 41, on verdict of guilty in case of Commonwealth v. Helen Boyle. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD and PORTER, JJ. Affirmed.

Indictment for kidnaping. Before WILLIAMS, P. J.

The court charged in part as follows:

[The testimony shows, and it is uncontradicted, that James Boyle and this defendant came to the home of Mr. Boyle's mother about Thanksgiving Day, 1908, and remained there until March 12, 1909; that neither he nor the defendant were employed at any kind of work during that time; that they seemed to be out of money, or had no money, and that about March 12, and probably prior to that time, they talked about going to Denver, and the testimony shows that this defendant and James Boyle stated to Mrs. Katharine Boyle, the mother of James

Boyle, and to Joseph Boyle, a brother, that they were going to Denver. The testimony of Mrs. Katharine Boyle, and possibly that of Joseph Boyle, also seems to show, or does show, that this defendant said a number of times that she was expecting some money from her father, and that she expected to get it about April 15, and this was along up to as late as March 12, 1909.] [23] On March 12 they left, and they told Mrs. Boyle they were going to Denver. Mrs. Katharine Boyle tells you that they had no money to go to Denver, and that she indorsed a note for her son, James Boyle, to get the money from McDowell's bank, with which to pay their fare; that some members of the family accompanied this defendant and James Boyle to an Erie train, in the borough of Sharon, which train went west, toward Cleveland, and would also be going towards Denver for a certain distance; that they both stated there that they were going to Denver, and that that was some time in the afternoon of March 12, 1909. [The next we hear of James Boyle and this defendant they appear at these Granger apartments in Cleveland, which are owned or rented by Miss Mills, and which Billy called the "hospital." Miss Mills tells you that on the morning of the thirteenth, which would be the morning after the afternoon they left Sharon stating to their friends and the family of the Boyles that they were going to Denver, they appeared at these apartments and wanted a suite of rooms; that she showed them this suite, and they made some inquiry as to whether there were any children about and stated that the last place they were they had been annoyed a great deal with children; that she told them there were no children about, and the apartments suited them and they remained there.] [24] They remained there from that time, March 13, until Billy reached there on the evening of the eighteenth, five days later.

[Now, you have heard the testimony of Mr. Whitla as to what occurred after the kidnaping of Billy; that he received, in all, four letters, and the purport of those letters

was that Billy was held for a ransom of $10,000. Those letters were read in your presence, gentlemen, and you heard the threats as to what would become of Billy unless the money was produced. Mr. Whitla detailed to you his efforts to comply with the request and demand they made by signifying his willingness to comply with their demands by inserting an advertisement in the different papers they instructed him to put it in, so that they would know whether or not he would do as requested. He told you of his effort to reach them at Ashtabula, with the package of money, and how it fell through; that he left the money under a cannon in the park there, and that it was subsequently returned to him by the mayor of Ashtabula. He tells you of the letters he received, the last one being on Monday, March 22, when he was directed to take a certain train and go to Cleveland and get off at Wilson avenue, and then go down to the drug store of Theodore Urban, on the corner of St. Clair avenue, as we remember it, and he would there find a letter addressed to Mr. Williams, and to follow the instructions in that letter. He tells you that he went to the drug store and asked for the letter and received it, and he testified as to what the letter directed him to do—that he was to go down to a confectionery store on the corner of Fifty-third and Standard streets and leave a package there for Mr. Hays. Mr. Whitla tells you that he complied with these instructions; that he went to this store and said he had a package that he wanted to leave there for Mr. Hays, and did leave a package, and in that package there was $10,000 in twenty, ten and five dollar bills; that in compliance with the request in the letter he was required to put in the package all of the letters he had received up to that time, which he did, and left the package containing the money and letters with Mrs. Lena Hendrickson, who was clerking there in the store owned by her mother.

Mrs. Hendrickson tells you that about five minutes after Mr. Whitla left the store James Boyle came in and inquired whether or not a package had been left there by

Mr. Williams for W. P. Hays, and was informed that Mr. Williams had left about five minutes before, and he expressed himself as being sorry he had missed him, and that the package was delivered to James Boyle.] [25] Mr. Whitla tells you that Billy Whitla was returned to the Hollenden Hotel that same night, about eight or nine o'clock in the evening.

The next step in the testimony is that on the night of Tuesday, March 23, about ten o'clock, Officer Shattock saw this defendant and James Boyle on Ontario street, in the city of Cleveland, not far from Michigan street, and something attracted his attention to them; that he followed them for a little way, and finally he and Detective Wood crossed the street and intercepted them as they turned into Michigan street; that they made some inquiries of them as to who they were and what their business was, but received no satisfactory answer; that Mr. Boyle told them he did not know who the defendant was, that he had met her on the street and she had requested him to escort her to the depot, and that was what he was doing; that their answers were not satisfactory and they took them to the central station in Cleveland; that as they got near the station, Mr. Shattock having the custody of Mr. Boyle and Mr. Wood the custody of the defendant, Boyle said "Good-by" and started to run away, when the policeman fired one shot in the air, at which Boyle either stumbled or intentionally fell; that he was then taken into custody again by Mr. Shattock and they were taken to the police station and held.

[The allegation of the commonwealth, and upon the testimony as to which they expect you to find this defendant guilty of aiding, assisting or abetting, is, in the first place, that the plan was formed in Sharon; that their giving out to their friends that they were going to Denver and that the defendant expected to get some money from her father's estate was for the purpose of making an answer to developments that they expected to occur; that is, if they succeeded in this plan of kidnaping, and being out of

money themselves, and they should be in different circumstances shortly afterwards, that then the story of the defendant expecting money from her father and their going to Denver would clear that matter up; that this whole thing was concocted by the defendant and James Boyle in Sharon before they left there, and that as a part of that plan they were looking for a place to keep Billy Whitla after he should be taken; that the intent was formed in Mercer county, and they then went to Cleveland and rented these apartments for two weeks, and that their purpose in getting apartments of that kind was to find and have a safe place in which to keep this boy after James Boyle had carried out his part of the arrangement; that the inquiry as to whether or not there were any children in those apartments was important in the way of showing the purpose for which the apartments were rented; that they went there and gave their names as Mr. and Mrs. Walters and subsequently the boy was brought there and there kept; that this defendant disguised herself, or wore an apron and a dust cap, or something of that kind, on her head, and had her face marked with red spots to indicate to Billy, as she said to Billy, that they were marks from the smallpox that she had had.] [26]   They further say that the declarations of the defendant after she was arrested tend to support that theory and to show that the plan was formed in Mercer county, and that this was the mere carrying of it out.   They alleged, and the witnesses tell you, that after they had arrested the defendant and taken her to the police station, she stated that she was the "frail little woman that planned the whole thing."   Another declaration that they have offered in evidence as being made by her was; "You think you are smart and that you will get your names and pictures in all the papers to-morrow; but we are not disappointed; we expected this when we planned this job," or words to that effect.   You, gentlemen, will remember the exact words of these statements for yourselves.   They tell you that after the defendant had been searched in the station house, and the

matron had taken from under her skirts these packages of $10,000 in money and the money had been laid on the table, the defendant walked around the table and said that she was "the little woman that could get the money."

[Now, the commonwealth ask you to find from all of these circumstances that this crime was concocted and planned by this defendant and James Boyle in Mercer county before they left Sharon at all. They had been without employment and, as far as the testimony shows, with little or no money, from Thanksgiving Day in November, 1908, until March 12, 1909, and the commonwealth alleges, and ask you to find, that during that time, considering Mr. Boyle's acquaintance in Sharon and his being there for that length of time and the opportunity he would have to become acquainted with prominent people in Sharon and with the children and whose children to abduct or kidnap, they formed the plan deliberately there, and, as a part of that plan, gave out that the defendant expected money from her father and expected to get it about April 15, and as a further concealment of that plan gave out, on the very day they left to go to Cleveland, a statement that they were going to Denver.] [27] [The commonwealth alleges that instead of doing that they went direct to Cleveland and rented apartments there in the house of Miss Mills for the express purpose of confining or securing this boy that they had already arranged to kidnap in Sharon; and they ask you to find that the declarations of the defendant after her arrest, as to being "the frail little woman that planned the whole thing," and she was "the frail little woman that could get the money," and "You think you are smart, but we expected this when we planned the job," were simply in pursuance of the prearranged plan made by the defendant and James Boyle in Sharon, Mercer county, Pennsylvania.] [28]

Before you can convict this defendant, you must be satisfied beyond a reasonable doubt that that is true, for anything she did in Cleveland would not be a crime in Mercer county, and she could not be convicted for any-

thing she did in Cleveland. The fact that this money, which is admitted to be the money that James P. Whitla left at the store of Mrs. Hendrickson, passed into the hands of James Boyle and that money was found concealed about the person of this defendant would not justify a conviction of the defendant in this county, because that all occurred in Cleveland. [If, however, you are satisfied beyond a reasonable doubt from all of the testimony in the case that the theory of the commonwealth is true—that is, if it is supported by evidence that satisfies you beyond a reasonable doubt that prior to their leaving Sharon on March 12, 1909, this defendant and James Boyle had formed in their minds a fully matured plan to kidnap Billy Whitla, and that their going to Cleveland and renting these apartments was simply in pursuance of that plan, then it would be your duty to find this defendant guilty on the second count of this indictment; but you must be satisfied of that fact beyond a reasonable doubt. ] [29]

Verdict of guilty, upon which the plaintiff was sentenced to imprisonment for twenty-five years and to pay a fine of $5,000.

*Errors assigned* were (23–29) portions of charge as above, quoting them.

*S. H. Miller* and *L. K. Porter*, with them *S. G. Porter*, for appellant.—We assert with confidence that there is no evidence in the record that can be contorted so as to show such an overt act committed by Helen Boyle in Pennsylvania; or even to show an intent formed in her mind, in the state of Pennsylvania, to commit such an offense: Com. v. Kunzmann, 41 Pa. 429; Com. v. Schmunk, 22 Pa. Superior Ct. 348; Simmons v. Com., 5 Binn. 617.

*Q. A. Gordon*, with him *J. Mede Lininger*, district attorney, and *T. C. Cochran*, for appellee.

OPINION BY ORLADY, J., December 12, 1910:

James Boyle was convicted under sec. 1 of the Act of

April 4, 1901, P. L. 65, of kidnaping William Whitla, an eight year old son of James P. Whitla, of Sharon, Mercer County, Pennsylvania. Helen Boyle, this defendant, was convicted of the offense defined in sec. 2 of this act, viz.: "Any person who shall aid, assist, or abet, in the taking or carrying away, or in the decoying or enticing away, or secreting of any child or person, with intent to extort money or any other valuable thing for the restoration or return of such child or person, such offender shall be guilty of felony, etc."

The only questions raised by this appeal are, first, the sufficiency of the evidence to show an offense under this statute, and second, whether the court of Mercer county had jurisdiction of the case.

In November, 1908, James Boyle, a former resident of Sharon, Mercer county, after an absence of two and a half years, returned to the town with this defendant who was ostensibly his wife. They remained there in the home of his mother until March 12, 1909, during which time they were without any known means of support, and he was not engaged in any business. They there announced their intention of going to Denver, Colorado, and Boyle secured sufficient funds from his mother to take himself and alleged wife to that place. Helen Boyle at the same time, stated that she expected soon to receive some money from her father. On the afternoon of March 12, James and Helen Boyle left Sharon, with the avowed purpose of going to Denver, but they went directly to Cleveland, Ohio, and the next day under the names of Mr. and Mrs. Walters, rented a two room housekeeping suite at a quiet apartment house, paying two weeks' rent in advance.

On March 18, about ten o'clock A. M., Boyle decoyed the child from a school at Sharon, where he was then in attendance as a pupil, stating that he, Boyle, had been sent by the child's father to get him so as to prevent the doctors taking him on account of his having small-pox, and he took him in a buggy to Warren, Ohio, where the child was induced to address a letter to his

mother in Sharon, and to post it in a street letter box. This letter contained a demand for a ransom of $10,000, and gave instructions as to the delivery of the money to a Mrs. Hendrickson at Cleveland, Ohio. Boyle, accompanied by the child, arrived at the selected rooms in Cleveland during the evening of the same day, where the child was taken charge of by this defendant, who was disguised as a nurse, and having simulated marks of smallpox on her face. The lad was so secreted that no person was permitted to see him, and when there was any alarm at the door, he was instructed to hide in a closet in the bath room.

During the stay of the parties in these rooms, several letters were sent to the parents at Sharon. The ones written by the child were dictated by Boyle, and those written by Boyle in regard to the payment of the ransom and the return of the child, were dictated by Helen Boyle. Pursuant to the instructions contained in these letters, Mr. Whitla, the father, on March 22, left at a designated place (Mrs. Hendrickson's store) in Cleveland, Ohio, a package containing $10,000 in paper money, which was to be called for by a Mr. Hays, and soon thereafter, James Boyle, calling himself Hays, came to this store and inquired for the package left for him, and received it.

That evening, Boyle and this defendant (who were known to the child as Mr. and Mrs. Jones) instructed him how he should go to meet his father, and Boyle went with him to the street where he put him on a car, with a note prepared by James and Helen Boyle to be shown to the conductor, reading, as follows: "Please leave boy off at Hollenden Hotel." The father was there in accordance with the instructions contained in the letters written by James and Helen Boyle, and then and there recovered the child.

The next evening the two Boyles were arrested in Cleveland as they were leaving the city, and when searched at the police station, the $10,000, which had been left by Mr. Whitla at Mrs. Hendrickson's store, were found secreted in the clothing of Helen Boyle. At the time of

her arrest and examination, the voluntary statements of Helen Boyle, while not in the nature of a confession, related so directly to her participation in the crime from its inception at Sharon, that they became material evidence in determining her knowledge of participation and motive in the enterprise.

Without any inducement or coercion she voluntarily stated to the officers, "Now just think of it, I am the little frail woman that planned the whole thing, . . . . there will be hell to pay in Sharon to-morrow. . . . That kid's eyes will be burned out with acids. . . . I'm the little woman that can get the money. . . . I'm not at all surprised at it, because we expected this when we planned the job. . . . You have got it on us, and got it right, and you have got the money, but I'm not afraid of their taking me back to Sharon, . . . . if they take us back to Sharon, they will have it on Buhl as strong as they have got it on us."

There is no intimation that any other person was in any manner implicated in this crime, and every act of each of these two parties had an important relation to the conduct of the other at every stage of the enterprise. To carry to a successful termination a crime of this character there would necessarily be frequent consultation and conference between the parties so that definite arrangements could be made as to many details, which must be accurately understood and provided for by the participants, before any overt act would with safety be committed by either. To secure the child would be but one step, and an unimportant one, unless arrangements were made for secreting and detaining him until the ransom should be paid. That every act of these confederates at Cleveland was a designed sequence of the plan arranged by them at Sharon, and that this woman was an important and necessary participant in this crime at its inception, was a reasonable and natural conclusion reached by the jury, in determining her guilty in manner and form, under this indictment.

The declarations of the woman in Cleveland related so pertinently to her knowledge of preëxisting facts and conditions in Sharon, and her conduct there conclusively shows the understanding of each and both in regard to the reception, detention, and release of the child for the purpose of securing the very money that was found secreted on her person that they were convincing items of evidence.

In order to sustain this conviction, there must be found in this record sufficient competent evidence to establish the commission by this defendant of an overt act in Mercer county, Pennsylvania, but this overt act, however, like any other substantive fact, may be determined by any adequate proof.

A well connected train of circumstances is as cogent of the existence of a fact as any array of direct evidence. It has frequently been stated, that circumstantial evidence is, in the abstract, nearly, though perhaps not altogether, as strong as positive evidence: in the concrete, it may be infinitely stronger—all evidence is more or less circumstantial, the difference being only in degree; and it is sufficient for the purpose when it excludes disbelief: that is actual, and not technical disbelief. The evidence adduced in this case recalls what was said in Commonwealth v. Kovovic, 209 Pa. 465: "These and other inculpatory facts and circumstances testified to not only indicated the appellant's guilt, but seem to be incapable of explanation on any other reasonable hypothesis." The very nature of the crime requires resort to circumstantial rather than direct evidence. A conspiracy may be proved, as other facts are proved, and parties performing disconnected overt acts, all contributing to the same result, and the consummation of the same offense, may by the circumstances and their general connection or otherwise, be satisfactorily shown to be conspirators and confederates in the commission of the offense. One party may allure a victim into a den, leaving it to others to effect a robbery, and all will be held equally guilty as confederates: Kelley v.

People, 55 N. Y. 565; People v. Miles, 192 N. Y. 541 (84 N. E. Repr. 1117). Standing alone, some of the items of evidence might not definitely show a community of intent, yet each was an important link in the chain of circumstances which was designed, by these parties, to be misleading and complicated; and when taken together they clearly showed a design and understanding which could lead to but one conclusion. The fact that the woman was apprehended in another state, in charge of the place in which the child was detained, and made there her incriminating statements, did not change the character of her relation to the crime in Mercer county, though at the time the physical abduction of the child was effected in Mercer county, she was not personally present, the evidence conclusively shows a continuing purpose, through a definite series of acts, to aid, assist and abet James Boyle in kidnaping this child, with intent to extort money for his restoration to his family. While in Sharon, their acts and declarations relative to their financial condition, as well as to their destination were competent, as bearing on their identity and on the motive for changing, within a few hours their announced plan, and names, and their disguises. The jury was warranted in finding that what Boyle did on March 12, was the reasonable and natural, as well as the direct and intended, result of their joint undertaking, and that, without this previous understanding in regard to the safe place in which to secrete the child while negotiating for the ransom, the whole project would have failed. This disposes of the case as presented by the question involved.

Helen Boyle's offense as charged in the indictment, was complete in Mercer county, the case was fairly tried by able counsel, and was submitted to the jury in a clear and adequate charge.

After an examination of each of the assignments we fail to find any reversible error and the judgment is affirmed.

MORRISON, J., dissenting:

I am unable to agree with the majority of the court in affirming the judgment in this case. The first count of the indictment charged the appellant, Helen Boyle, with kidnaping and abducting William Whitla, a male child, from the county of Mercer, in the state of Pennsylvania, on April 7, 1909, and the second count charged that she did, on the same date and at the same place, aid, assist and abet James Boyle in kidnaping, abducting and carrying away the said William Whitla from the county of Mercer, Pennsylvania. While the indictment charges the abduction to have been on April 7, 1909, the testimony clearly establishes that the child was actually abducted and carried away by James Boyle on March 18, 1909, and this fact is conceded on all hands.

The jury found the defendant not guilty under the first count, but guilty under the second count of the indictment, and she was sentenced to undergo imprisonment in the penitentiary for a period of twenty-five years.

James Boyle was tried and convicted under a separate indictment for kidnaping and carrying away from the county of Mercer, Pennsylvania, the said child, William Whitla, and he was sentenced to undergo imprisonment in the penitentiary for life. At the trial it was clearly proved and is a conceded fact that James Boyle and Helen Boyle left Mercer county, Pennsylvania, on March 12, 1909, and on the same day arrived in the city of Cleveland in the state of Ohio, and that Helen Boyle remained in that city and state continuously from that day until March 23, 1909. There is no pretense made by any one that on March 18, 1909, when James Boyle kidnaped and carried away from Mercer county the child, William Whitla, Helen Boyle was within the state of Pennsylvania. I understand the majority of this court to concede that to sustain the conviction of Helen Boyle there must be found in the record evidence that she committed some overt act in regard to the abduction in the county of Mercer, in the state of Penn-

sylvania, and that is my view of the law, but I am unable to find such evidence in the record. Conceding that Helen Boyle was in Cleveland, Ohio, on the day of the abduction and for several days next preceding that date, I cannot see how she could have aided, assisted or abetted James Boyle in committing the felony in Mercer county. The offense of which she was convicted seems to be embraced in the word abet, and I do not understand that anybody contends that she actually aided or assisted James Boyle on March 18, 1909, in kidnaping and carrying away the child from the county of Mercer, in the state of Pennsylvania. This being so, did she abet him in committing this felony? The best definition I find of the word abet is: "In law, to encourage, counsel, incite or assist in a criminal act—implying in the case of a felony personal presence." I find in the record no evidence supporting the charge that Helen Boyle either aided, assisted or abetted James Boyle in committing the felony in Mercer county on March 18, 1909.

It is true that it was proved that when arrested in Ohio Helen Boyle said in substance: "I am the little woman who planned the whole scheme." But this planning might all have been done while Helen Boyle and James Boyle were in Cleveland, Ohio, during the several days immediately prior to the abduction. Under all of the evidence the jury could only guess as to where the abduction was planned. It was just as likely to have been in Ohio as in Pennsylvania, even if such planning was sufficient evidence of aiding, assisting or abetting James Boyle in committing the felony. But I am of the opinion that, even if the plan to abduct the child was made in Mercer county, between James and Helen Boyle, and they then left Mercer county and went to Cleveland, Ohio, on March 12, 1909, where Helen Boyle remained continuously until several days after the abduction, such planning, without more, would not be sufficient to convict Helen Boyle of the crime charged in the second count of the indictment.

There can be no doubt that Helen Boyle committed

a serious crime in the state of Ohio in aiding and assisting James Boyle in secreting and holding the child until they received a large sum of money for surrendering the child to its father, but whatever crime she committed seems to me to have been in the state of Ohio, and she should be there tried and punished.

I would reverse the judgment and discharge the defendant without day.